UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


FREDRICK HARRIS                    CIVIL ACTION NO. 08-cv-2004

VERSUS                             JUDGE HICKS

WARDEN, DAVID WADE                 MAGISTRATE JUDGE HORNSBY
CORRECTIONAL CENTER


**REPORT AND RECOMMENDATION**

**Introduction**

Fredrick Harris ("Petitioner") was convicted of forcible rape and public bribery after

a bench trial before Caddo Parish District Judge Leon Emanuel. His conviction was affirmed

on direct appeal. State v. Harris, 917 So.2d 761 (La. App. 2d Cir. 2005), writ denied, 938

So.2d 67 (La. 2006). Petitioner also pursued without success a state post-conviction

application. He now seeks federal habeas corpus relief on several grounds. It is

recommended, for the reasons that follow, that his petition be denied.

**Sufficiency of the Evidence**

Petitioner's convictions were based on the abuse of his position as a Shreveport police

officer to take money from and have sex with a young woman he stopped for a traffic

offense. He was convicted of forcible rape, which Louisiana defines as a rape committed

when the intercourse "is deemed to be without the lawful consent of the victim because it is

committed ... [w]hen the victim is prevented from resisting the act by force or threats of

physical violence under circumstances where the victim reasonably believes that such

resistance would not prevent the rape." La. R.S. 14:42.1. The public bribery statute, La. R.S. 14:118, first defines the crime as the giving or offering to give anything of apparent value to a public employee or person in position of public authority, with the intent to influence his conduct in relation to his position, employment, or duty. The statute adds that the acceptance of, or the offer to accept, anything of value under such circumstances, by the public employee, shall also constitute public bribery.

The State's first exhibit was a video and audio recording taken from Petitioner's patrol car. The events on the recording (summarized at Tr. 85) and trial testimony from the victim and investigating officer Sgt. Dennis Pratt firmly establish several facts. Petitioner, a patrol officer with the Shreveport Police Department, was on duty around noon on January 16, 2003 when, in his marked patrol car, he stopped a car driven by L.T., a young woman, for alleged failure to yield. In the car with L.T. was her female roommate, S.D. Petitioner discovered that L.T. had two outstanding misdemeanor warrants. He placed L.T. under arrest, handcuffed her, and put her in the back of his patrol car.

Petitioner called for another officer to come to the scene and use a screwdriver to remove the license plate from L.T.'s car, apparently based on an alleged lack of proof of insurance. An officer arrived, removed the plate for Petitioner, and left the scene. L.T. mentioned that she had money in her pocket, and Petitioner told L.T. her bond amount. He radioed that he was on his way to the jail with a black female. Soon afterward, Petitioner turned off the video and audio recording devices in his car. There was trial testimony that

jail records showed no female was booked that day, there was no indication of a ticket or other record related to the traffic stop, and the warrants for L.T. remained active.

Police received a complaint about the incident. Sgt. Pratt testified that he went to L.T.'s residence, but she was gone. He talked to the roommate, S.D., who said Petitioner left her with the car at the scene of the traffic stop. L.T.'s boyfriend came to the scene a few minutes later, and he and S.D. returned to the house. S.D. reported that they began calling bail bondsmen to try to arrange for L.T.'s release when, about two minutes after they got home, L.T. knocked on the door. Pratt testified (with no hearsay objection) that S.D. told him that L.T. said the officer "had made a corner with her," taken some money from her, and brought her home. The "made a corner" reference is apparently slang for having sex. See Tr. 91.

Sgt. Pratt was able to locate L.T. and take a recorded statement from her later that day. The defense introduced and played a recording of that statement on cross-examination of Sgt. Pratt. The court reporter did not transcribe the recording as it was played, and there does not appear to be a written transcript in the record filed with this court. Pratt agreed during questioning that, in this first recorded statement, L.T. denied anything sexual happened. Pratt said he sensed L.T. was not telling the truth because every time the police asked her if anything sexual had happened, she would start crying, pause, and then say nothing happened. Pratt testified that L.T. also told him that Petitioner took $200 from her and put it over the visor in his car.

Pratt testified that, later that day, he took L.T. to jail to book her on the outstanding warrants. It had been arranged for L.T. to be released on her own recognizance. Around that time, L.T. said she had omitted some things from her first statement and wanted to go back on tape. Pratt testified that L.T. said in the second statement that Petitioner molested her by massaging her breasts and penetrating her vagina with his finger.

The current record does not have L.T.'s first recorded statement, but the statement is summarized in a written police report by Sgt. Pratt. Tr. 87-89. According to the summary, Petitioner told L.T. that there were two warrants for her arrest (expired plates and no insurance), so he arrested her. He also wrote her a ticket for no insurance and put a green sticker on the back window of her car. L.T. said that when they arrived at the police station, Petitioner said he was going to be nice to her and be her bondsman. She asked what that meant, and he said that she would have to pay him to get out of jail. He drove away from the jail, stopped, and took approximately $200 from the front pocket of L.T.'s pants. He put the money above the visor in his patrol car. Petitioner then took L.T. home, where he told her to tell her boyfriend that if he wanted the license plate to the car returned he would have to pay Petitioner $60. The boyfriend, Preston, had Petitioner talk with his insurance company, and Petitioner returned the license plate. Petitioner left, but he came back 10 or 15 minutes later to give L.T. her ID card and a copy of her driver's license. L.T. said that she told Preston and S.D. what Petitioner had done. Preston got angry, called the police, and made a complaint, but L.T. told him she was afraid because Petitioner had her ID and knew where she lived and worked. Preston then called the police again and told them that he did not want

anything done. A female officer came to the house in response to the call, and L.T. told her that she did not want anything done. As Pratt testified to above, L.T. denied that anything sexual had happened, but started crying when such questions were asked. (This police report summary of the statement was not a trial exhibit, but there does not appear to be a dispute that it fairly summarizes the recorded statement, which this court does not have.)

Pratt testified that, after he processed L.T. on her warrants, he had her retrace the steps that Petitioner took once he left the jail with her. L.T. identified the spot where Petitioner stopped, took $200 from her, and put it above the visor in his car. Pratt recalled that L.T. told him that, when they saw her car was gone, Petitioner said he could not be driving L.T. around, so she had to do something for him. L.T. then identified the place, an elevated area with oil pumps in the 100 block of Pete Harris Drive, where Petitioner took her.

According to Pratt, L.T. said that Petitioner went to his trunk, went in a black bag, and got a condom out with black paper on it. He opened the back door and told L.T. to come to the edge of the door, pulled her clothes down, put the condom on, and had vaginal sex with her. According to Pratt, L.T. said Petitioner afterwards took the condom off, wrapped it in a paper towel, put it in his front pocket, and poured some water over her, before taking her home. There is no indication that these remarks by L.T. to Sgt. Pratt were recorded, and it does not appear they were even mentioned in Pratt's written reports that are in this record. There was also no hearsay objection to this testimony.

L.T. also testified at trial. She said she asked Petitioner how much it was going to take for her to get out of jail, and he said $200 or $300. Petitioner, who had just cashed her

paycheck for more than $400, said she had that much in her pocket. As they pulled into the

parking area near the jail, Petitioner asked if L.T. had the money on her right then. When she

said she did, Petitioner said, "I'm no longer the arresting officer, I'm your bondsman." He

made a U-turn, drove a short distance away, stopped, got L.T. out of the backseat, put his

hand in her pocket, took out $200, and put the money over his sun visor. L.T testified that

she believed Petitioner returned the rest of the money to her when he took her home, but she

was not sure. L.T. said Petitioner explained that the misdemeanor warrants would not go

away, she was just buying herself a little time.

Petitioner then drove L.T. to where he had made the traffic stop, but her car and S.D.

were gone. L.T. said she told Petitioner he would have to give her a ride home, but he replied

"that this was a police car, that he wasn't fixing to be doing no free-ass riding around, that

I was going to have to f*** or do something." L.T. said she said nothing in response, and

Petitioner drove them to the area off Pete Harris Drive. She said Petitioner had on gloves and

what she believed was a black condom, which she guessed he put on while he was driving.

Petitioner got out and, with L.T. in the backseat, pulled her pants down and penetrated her

with his penis. She said that afterward he "put all of his stuff together in his hands and the

gloves," but she did not see what he did with those items. (L.T. did not describe Petitioner

retrieving the condom from a bag in the trunk, as Pratt said L.T. described the events to him.)

L.T. testified that Petitioner took her home and attempted to get her boyfriend,

Preston, to give him $60 for the return of his license plate or "tags." Preston called the

insurance company, which confirmed that he had insurance. Petitioner left, but he returned

with a ticket for L.T. for no proof of insurance, which started an argument between Preston and Petitioner.  L.T. said that Petitioner left but returned once again and told L.T., "I don't know what you done told these people, but you better calm them down cause you know you still got these warrants on you," returned L.T.'s ID, and left.

The prosecution, apparently in an effort to demonstrate why L.T. feared the policeman, brought out on direct that L.T. had prior convictions of simple battery, disturbing the peace, illegal use of a weapon, and aggravated battery.  On cross-examination, L.T. admitted a conviction for possession of drug paraphernalia and that she had at times used cocaine, daily during some periods.  L.T. also admitted she had a civil lawsuit pending based on the incident.

L.T. said she did not originally tell police the full truth because she did not think they would believe her.  Defense counsel said that L.T. said she was handcuffed during the rape, and he asked if there were any cuffs on her feet to keep her from kicking or anything on her mouth to stop her from biting.  L.T. responded by asking why she would kick or bite a man when she was in handcuffs, with her pants around her ankles like shackles, and he was armed with a gun.  She also said she was afraid to make a complaint because Petitioner kept coming back to her house, and she feared he was listening to the police radio and would hear a report of a complaint and be the nearest policeman to her house.

Sgt. Pratt testified that a search warrant was issued for Petitioner's patrol car.  The officers found inside $382 in cash (19 twenty-dollar bills and two one-dollar bills) in the car's sun visor, packages of black condoms in the trunk, a bottle of KY jelly, and a number

of traffic tickets that had been filled in but not actually issued and turned in. (Police also recovered assorted papers with women's phone numbers on them, but the judge ruled the items irrelevant.)

Judge Emanuel recessed to deliberate and returned to issue a bench ruling. He noted that the State attempted to meet its burden with the testimony of Sgt. Pratt and L.T. He commended Pratt for his efforts, but said the court could not decide the case based on Pratt's hearsay, assumption, or commentary testimony. He also noted the lack of physical or scientific evidence. Thus, the strength of the State's case was based primarily on the testimony of L.T. who "had her problems." Among them were two prior inconsistent statements, and an unwillingness to cooperate in the investigation and trial. L.T. had not appeared at a number of set trial dates, but she testified that she never received a subpoena, and she appeared at trial only after being taken into custody. Another problem noted by the judge was L.T.'s lengthy criminal history, and there was also her admitted abuse of drugs.

Judge Emanuel said he often saw cases rejected or dismissed by the State where the evidence was far more sufficient than in this case, and he believed Petitioner was taken to trial because he was a police officer. Turning to the evidence, he said:

> And finally, for your information, had it not been for two items seized from your patrol car, perhaps the outcome of this case would be different. This Court believes that [L.T.] with all of her faults and questionable attributes would not have known about the money in the sun visor, and most significantly, the existence of condoms, the location of condoms, or the color of condoms had the allegation of rape not taken place as she testified here on yesterday and today. It is this evidence which sufficiently and adequately corroborates her in-court testimony.

Tr. 328-9.

Judge Emanuel then found that the State had presented proof beyond a reasonable doubt and found Petitioner guilty of forcible rape and public bribery. Tr. 329-30. The state appellate court found the evidence sufficient to support the convictions. Petitioner challenges that conclusion.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior

holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. <u>Pape v. Thaler</u>, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862 (2010).

The state appellate court reviewed the testimony and other evidence in great detail. It identified the elements of the crimes of forcible rape and public bribery and applied the Supreme Court's <u>Jackson</u> standard. The state court reviewed the evidence, including the weaknesses with L.T.'s testimony, but found no internal contradiction or irreconcilable conflict with any physical evidence. The state court noted that it does not assess the credibility of witnesses on appeal, and it concluded that the trial judge did not err in entering the convictions. <u>State v. Harris</u>, 917 So.2d at 765-68.

Petitioner's primary challenge is that the only evidence of forcible rape is L.T.'s testimony, and he faults the trial court for basing its credibility determination on facts not supported by the evidence. Petitioner points to the judge's comment that the outcome would have been different but for the money and the condoms seized from the patrol car and the victim's knowledge of them. Petitioner points out that during L.T.'s trial testimony she did not refer to a location of the condoms (which police found in the trunk). Sgt. Pratt did testified that L.T. told him that Petitioner got the condom from the trunk., but L.T. testified at trial that she believed Petitioner put on the condom while he was driving. She never said

where she believed the condom was stored. Even if Pratt's testimony that L.T. said Petitioner took the condom from the trunk is ignored, there remains L.T.'s testimony that Petitioner wore a condom that she believed was black, and several black condoms were found in the patrol car.

Petitioner also argues that L.T.'s knowledge of the money can be discounted because the $382 found was in twenty dollar bills and one dollar bills, while an affidavit in support of a search warrant for the patrol car alleged that Petitioner took two one-hundred dollar bills and put them over the sun visor. However, the search warrant affidavit was based on what S.D. told officer Pratt that L.T. had said (Tr. 27). L.T. herself never testified that the $200 was in one-hundred dollar bills. The $200 was referred to multiple times during trial testimony from L.T. and Pratt, but there was no testimony as to the specific denominations of the currency. (The police reports also include no mention of the denominations, so it is not known why the warrant application referred to one-hundred dollar bills.) The warrant application's reference to one-hundred dollar bills was perhaps a basis for questioning or cross-examination, but its mere existence did not deprive L.T.'s testimony of the weight afforded by Judge Emanuel.

Petitioner notes that the Louisiana appellate court applied its rule that the testimony of a single witness, if believed by the trier of fact, is sufficient support for a conviction in the absence of internal contradiction or irreconcilable conflict with physical evidence. Petitioner contends that is not the case, but there was no conflict with any physical evidence. There were inconsistencies with prior statements, but there were not internal contradictions in

L.T.'s eventual trial testimony. This case came down to a pure issue of credibility. The trial judge, well aware of that, pointed out the weaknesses in L.T.'s testimony but, after seeing and hearing her testify in person, found her credible. "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). The trial judge made a considered, first-hand assessment of the credibility of the key witness, and that assessment was upheld on state appeal. One might quibble with the verdict if it were being decided in the first instance, but this federal habeas court cannot say that the state court's adjudication of this issue was not only incorrect but an objectively unreasonable application of the Jackson standard. Accordingly, habeas relief is not permitted on this claim.

The same is true with respect to the public bribery conviction. Petitioner contends that the evidence shows only that he fraudulently represented himself as a bail bondsman and took the victim's money without consent. He labels the conduct reprehensible but not public bribery. The overall evidence was sufficient to find that Petitioner, a public employee, "shook down" L.T. for $200 to avoid her immediate arrest on the outstanding warrants. That is accepting something of value in exchange for influencing Petitioner's conduct in relation to his duty, so it falls squarely within the statute.

**Brady Claims**

### A. Crime Lab Testing

The record mentions in a number of places that various items of evidence collected, included swabs from the mouths of Petitioner and L.T., were sent to the crime lab. Petitioner

claims that the State violated his rights under <u>Brady v. Maryland</u>, 83 S.Ct. 1194 (1963) when it did not disclose to the defense prior to trial any results from testing at the crime lab. <u>Brady</u> held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. 83 S.Ct. at 1196-97.

To establish a <u>Brady</u> claim a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material. <u>Wright v. Quarterman</u>, 470 F.3d 581, 591 (5th Cir. 2006) . Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 115 S.Ct. 1555, 1566 (1995). A petitioner must show a "reasonable probability of a different result." <u>Banks v. Dretke</u>, 124 S.Ct. 1256, 1276 (2004).

The defense made much in the opening statement of the fact that there would be no physical evidence to link Petitioner to the alleged crimes. There was testimony from Sgt. Pratt that he could not find a used condom at the scene, and there were no other pieces of evidence that might have been tested that would have helped establish the guilt or innocence of Petitioner. He nonetheless complains that the State did not provide crime lab results. He gives no hint as to whether there are any results or reports that would have helped the defense or that exist at all.

Petitioner first raised this in a post-conviction application. The State responded that it had no scientific evidence to withhold. The only items it had that could be tested for DNA were the swabs taken from Petitioner and the victim, but that would only show whether the

two were related. Tr. 479-80. Judge Emanuel rejected the claim on the grounds that Petitioner did not meet his burden of proof. Tr. 542. The state appellate court stated that Petitioner "failed to meet his burden of proving that the trial court erred in denying his application for post-conviction relief." Tr. 646(C). The Supreme Court of Louisiana denied writs without comment. Tr. 761.

This claim was adjudicated on the merits in the state court, so habeas corpus relief is available only if the adjudication was an objectively unreasonable application of the <u>Brady</u> principles. <u>See</u> <u>Mahler v. Kaylo</u>, 537 F.3d 494, 499 (5th Cir. 2008). The state court's application of <u>Brady</u> to the "facts" presented by Petitioner was not an unreasonable application of <u>Brady</u>. Petitioner never established that there were any crime lab testing results in existence. Sgt. Pratt testified that the evidence taken from the patrol car had been retrieved from the crime lab before trial, but he never said that any items had been subjected to any testing. Even if it is assumed every item of evidence was tested, Petitioner has never articulated how the results would be material, meaning they gave rise to a reasonable probability of a different result. Habeas relief is not permitted on this claim.

**B. Quid Pro Quo**

Petitioner also claims the State violated <u>Brady</u> when it did not inform defense counsel about an alleged "quid pro quo agreement" between the State and L.T. that called for L.T. to accuse Petitioner of forcible rape in exchange for a recognizance bond and a "pay day." Petitioner says the defense was "ambushed" by L.T.'s revelation at trial that it was Sgt. Pratt

who obtained for her a release on her own recognizance (ROR) and that it was Pratt's suggestion that she sue the City.

Sgt. Pratt testified at trial that he had another detective speak to a city court judge about releasing L.T. from the misdemeanor traffic warrants ROR because she was a victim in an investigation that was underway, and the judge agreed to do so. Tr. 176. There was no evidence whatsoever that this procedure was done in exchange for L.T. accusing Pratt's fellow officer of rape. The arrangement for L.T. to be released was also described in Sgt. Pratt's police report (Tr. 92), which was fully disclosed to the defense in pretrial discovery. Tr. 8. This claim lacks merit.

### C. Civil Suit

Defense counsel asked L.T. on cross-examination if she had filed suit against the City in connection with this matter. She replied that she did not know and that her attorney would have to be asked. Counsel asked if it was L.T.'s idea to sue the City. She replied: "No, actually it was the detectives, if you really want to know." Counsel suggested L.T. and S.D. hatched the idea of a lawsuit. L.T. responded: "No, actually the detective said making statements like this we probably need to get us an attorney." Tr. 266-67.

Petitioner suggests Sgt. Pratt recommended a lawsuit to influence L.T. to change her initial statements in order to be successful in a suit. Petitioner does not, however, offer a scintilla of evidence to support his accusation, and there is none in the record. The fact that defense counsel broached the subject shows that he was aware of a civil suit (or its potential) before trial. This claim also lacks merit.

**Knowing Use of Perjury**

The Due Process Clause of the Fourteenth Amendment forbids the prosecution to knowingly use, or fail to correct, perjured testimony. <u>Giglio v. U.S.</u>, 92 S.Ct. 763, 766 (1972); <u>Napue v. Illinois</u>, 79 S.Ct. 1173, 1178-79 (1959). To prove that the prosecution has denied him due process of law by relying on perjurious testimony, a petitioner must prove that (1) a witness for the state testified falsely; (2) the state knew the testimony was false; and (3) the testimony was material. <u>Knox v. Johnson</u>, 224 F.3d 470, 477 (5th Cir. 2000), citing <u>Giglio</u>, <u>supra</u>.

Petitioner argues Sgt. Pratt committed perjury at trial when he testified that L.T. told him Petitioner had intercourse with her. He bases this on L.T.'s original denials that there was intercourse, but he ignores that Pratt acknowledged those original denials and said L.T. eventually told him that Petitioner did rape her. L.T. offered similar trial testimony. It does not appear the state courts specifically addressed this claim, and there is some uncertainty as to whether the claim has been exhausted or is perhaps subject to a procedural bar. In any event, it is wholly lacking in a factual basis and should be denied on the merits.

**Ineffective Assistance of Counsel**

**A. Standard of Review**

Petitioner raised several claims of ineffective assistance of trial and appellate counsel in his post-conviction application, and he repeats them here. To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel

performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Section 2254(d) imposes the unreasonable application standard to a Strickland claim "that was adjudicated on the merits in State court proceedings." It must first be decided whether all of Petitioner's Strickland theories fall within that description. Petitioner's original post-conviction application (Tr. 544) argued five theories of ineffective assistance of counsel: (1) no objection to trial judge's reliance on closing argument rather than evidence; (2) not requiring the State to prove the elements of forcible rape during the direct examination of the victim; (3) failure to investigate medical or DNA evidence; (4) failure to file a motion for speedy trial; and (5) failure to subpoena witnesses. Petitioner almost immediately began to file amendments to his application, with seven of them filed between November 2006 and July 2007. Tr. 557-607. Included in those amendments were four other theories of ineffective assistance of counsel: (1) failure to challenge the veracity of the affidavit underlying the search warrant; (2) failure to challenge evidence seized as outside the scope of the warrant; (3) no objection to a violation of L.C.E. Part 611(D); and (4) failure of appellate counsel to raise ineffective assistance of trial counsel.

The State's response to the post-conviction application addressed all of the Strickland theories asserted in the original and amended applications. Tr. 470-96. The trial court, in its August 2007 ruling entered after all the amendments were filed, began by reciting the various filings that led up to the decision. The court noted that the State had requested a second extension of time to respond to the application "due to the Petitioner filing several

supplemental motions to the post-conviction application." The court went on to address the merits of the five theories set forth in the original application but never mentioned any of the theories submitted in the amendments or supplements. Tr. 535.

Petitioner filed an application with the state appellate court, and he quickly pointed out that the trial court did not address any of his supplemental claims. He then presented arguments on the merits of each of his theories. Tr. 498-533. The state appellate court acknowledged that Petitioner sought review of the denial of his application "which alleges various errors by both the petitioner's trial and appellate counsel." The appellate court also acknowledged that Petitioner had supplemented his writ application with a copy of the State's response (which briefed all nine <u>Strickland</u> claims). The court summarily denied the application with the observation that Petitioner had "failed to meet his burden of proving that the trial court erred in denying his application for post-conviction relief." Tr. 646(C). Petitioner next filed an application with the Supreme Court of Louisiana and argued the merits of all nine theories of ineffective assistance that he presents in his federal petition. Tr. 647-78. The Supreme Court denied the application without comment.

The original five theories were, without question, adjudicated on the merits. The rationale in the recent <u>Richter</u> decision indicates that the other four theories were also adjudicated on the merits for habeas purposes, entitling the state court's decision to Section 2254(d) deference. The state court in <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011) denied a state habeas application in a one-sentence summary order. <u>Richter</u> held that Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to

have been 'adjudicated on the merits.'" <u>Richter</u>, 131 S.Ct. at 785. The prisoner argued that Section 2254(d) should be inapplicable because the state court did not say it was adjudicating the claim on the merits, but the Supreme Court responded that the state court "did not say it was denying the claim for any other reason." <u>Id</u>. at 784. It added that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id</u>. at 784-85. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." <u>Id</u>. at 785. The prisoner suggested that perhaps the members of the state supreme court could not agree on reasons to deny the petition, but the Court rejected that as pure speculation insufficient to overcome the presumption.

The Eleventh Circuit, discussing <u>Richter</u>, has held that an adjudication on the merits is any state court decision that does not rest solely on a state procedural bar. <u>Loggins v. Thomas</u>, ___ F.3d ___, 2011 WL 3903402, *12 (11th Cir. 2011). The Fifth Circuit was already using a similar approach, looking to (1) what state courts have done in similar cases; (2) whether the case history suggests that the state court recognized any ground for not resolving the case on the merits; and (3) whether the state court's opinions suggest reliance on procedural grounds rather than an adjudication on the merits. <u>Miller v. Johnson</u>, 300 F.3d 274, 281 (5th Cir. 2000).

When assessing whether an adjudication was on the merits or rested on a procedural bar, the federal court must "look through" the final state habeas decision if it is silent, such

as the writ denial in this case, and examine the last clear and explained state decision. <u>Ylst v. Nunnemaker</u>, 111 S.Ct. 2590 (1991). If that principle is applied in this case, this court looks to the appellate court's decision. It made specific reference to the claim of ineffective appellate counsel, which was included only in a supplemental submission. Petitioner's application, as well as the State's response that he filed with the appellate court, clearly and expressly asserted all of the theories now presented in federal court. The appellate court denied the claim on the merits with no hint of a procedural bar or similar obstacle. The undersigned finds that all of the <u>Strickland</u> claims presented in the federal petition were adjudicated on the merits in the state court, so the deference required by Section 2254(d) is applicable.

The question then is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was merely incorrect but whether the determination was unreasonable, which is a substantially higher threshold. <u>Schriro v. Landrigan</u>, 127 S.Ct. 1933, 1939 ( 2007). And, because the <u>Strickland</u> standard is a general one, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. The federal court's review is thus "doubly deferential." <u>Knowles v. Mirzayance</u>,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 131 S.Ct. at 786 (analyzing a <u>Strickland</u> claim). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. <u>Id</u>. Thus, "even

a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

Finally, a Strickland petitioner must overcome the limitations of Section 2254(d) "on the record that was before the state court." Cullen v. Pinholster, 131 S.Ct. 1388 (2011). It is reversible error for a district court to hold a federal hearing to flesh out such a claim. Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011).

### B. No Challenge to the Search Warrant

Sgt. Pratt applied for and obtained a search warrant to search Petitioner's patrol car and home. Petitioner argues that his attorney should have challenged the veracity of the affidavit underlying the warrant. He accuses Pratt of attempting to deceive the issuing judge by entering a false statement in the affidavit that: "According to [L.T.], ... [Petitioner] puts a condom on out of a black bag, then has sexual intercourse with her." Petitioner contends that the trial evidence showed that, at the time the warrant was obtained, L.T. had continually denied that she was raped or had any sexual content with Petitioner.

The only false statement or attempt at deception in connection with this issue is committed by Petitioner. That portion of the affidavit begins: "Affiant interviewed [S.D.]. According to statements from [S.D.], [L.T.] told her that ... ." The remainder of the paragraph is Pratt's description of S.D.'s statement to him about what L.T. told S.D. when she arrived home after the traffic stop. There is no contention in the affidavit that L.T. directly told Pratt that Petitioner raped her. Affidavit, pp. 27-28.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 106 S.Ct. 2574, 2583 (1986). Evidence from a search is ordinarily admissible where probable cause for a warrant is based on inaccurate information, so long as the officer's reliance on the warrant is objectively reasonable. U.S. v. Leon, 104 S.Ct. 3405 (1984). One exception to the rule is where the affidavit that supports the warrant contains material false statements or omissions. A misstatement vitiates an affidavit only where the misrepresentation is the product of deliberate falsehood or reckless disregard for the truth. Franks v. Delaware, 98 S.Ct. 2674 (1978).

Counsel would have had to overcome the demanding standards of Franks, Leon, and similar authorities to prevail on a motion to suppress. As discussed above, there was simply no factual basis for a motion to suppress on the grounds claimed by Petitioner. The warrant application relied on hearsay from S.D., but probable cause "may be and often is founded on hearsay." Marino v. Dretke, 450 F.3d 158, 170 (5th Cir. 2006). Petitioner argues that the affidavit was insufficient because it did not establish S.D.'s reliability as an informant. S.D. was not an anonymous tipster or confidential informant. She was identified by her full name, and the facts and circumstances surrounding her hearing L.T.'s recounting of the incident were fully disclosed. This court cannot find, on this record, that the state court's rejection

of the <u>Strickland</u>/<u>Kimmelman</u> claim was not only wrong but so incorrect to be an objectively unreasonable application of the principles established in those cases.

## C.  Scope of the Warrant

The investigative reports recount that L.T. told Sgt. Pratt that Petitioner "took approx. two hundred dollars from her."  Tr. 89.  Pratt testified at trial that he did not know the denominations of the currency allegedly taken. In his warrant affidavit, however, Pratt testified that S.D. told him that L.T. said Petitioner put his hand in her pocket "and took out 2 $100 bills, and put them over his visor on the driver's side."  The warrant authorized Pratt to search the patrol car and Petitioner's apartment for property including "$100 dollar bills." Tr. 26-27.  No one-hundred dollar bills were found, but Pratt did seize 19 twenty dollar bills and two one-dollar bills ($382) from the place in the car where S.D. indicated the money would be found.

Petitioner argues that counsel was ineffective because he did not file a motion to suppress the cash on the grounds that it was outside the specification of the search warrant. The officers did not have to exceed the permitted scope of the warrant, which allowed a search of the car for currency, to find the money.  And if an officer "has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first."  <u>Horton v. California</u>, 110 S.Ct. 2301, 2309 (1990).  Under these circumstances, the state court was not objectively unreasonable in rejecting this <u>Strickland</u>/<u>Kimmelman</u> claim.

### D. Judge's Reliance on Arguments

Petitioner argues that his trial counsel was ineffective because he did not request a new trial after Judge Emanuel improperly relied on the State's closing argument as evidence. He points to the judge's comment that L.T., if there had been no rape, "would not have known about the money in the sun visor, and most significantly, the existence of condoms, the location of condoms, or the color of condoms had the allegation of rape not taken place as she testified here on yesterday and today." Tr. 328.

Petitioner argues that it was the prosecutor, during his closing, who mentioned the existence of several packages of black condoms, and he represents that L.T. never testified to the existence, location, or color of the seized condoms. Petitioner represents that when L.T. was asked if she knew the color of the condom used in the rape she said, "no." Petitioner conveniently omits the rest of her answer, which reads in full: "No, I think it was black, I'm not sure." Tr. 241. L.T. did not testify at trial as to the location of any other condoms, and she said she thought Petitioner put on the condom when he was driving. Sgt. Pratt testified, however, that L.T. told him that Petitioner "went to his trunk, went to a black bag and got a condom out which had a black paper on it ... ." Tr. 176. That was hearsay, but there was no objection to the testimony. All of this testimony taken together provides a factual basis for the trial judge's comment, without any improper reliance on closing arguments. Furthermore, the judge stated during his ruling that he was "mindful that the statements of counsel are not to be included or considered as evidence, but are simply intended to help this Court." Tr. 326.

Petitioner also alleges the judge improperly relied on closing arguments with respect to the money found over the sun visor, but L.T. specifically testified that Petitioner took $200 from her and placed it over the sun visor. Petitioner attempts to attack this whole line of evidence because the denomination of the money above the visor did not match the reference to hundred-dollar bills in the search warrant. As discussed above, there are several references in the trial testimony to Petitioner taking $200, without specification of the denominations of the bills. The only reference to hundred-dollar bills is found in the search warrant and related affidavit. That conflict might have been an area worthy of exploration on cross-examination, but its mere existence does not mean there was no evidence of cash above the visor that the court could rely upon to corroborate L.T.'s testimony.

The state court denied the claim that counsel was ineffective for not moving for a new trial on the grounds discussed above. The arguments do not have nearly the support in the record that Petitioner suggests. The state court's denial of this <u>Strickland</u> claim was not an objectively unreasonable application of the <u>Strickland</u> principles.

### E. Rape Elements Not Established on Direct Examination

Louisiana Code of Evidence Art. 611(D) states that a witness is subject to redirect examination "as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case." The article adds: "When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to re-cross on such matters." Petitioner argues that his attorney was ineffective because he did not object to the prosecutor questioning L.T. on redirect about matters not covered on cross. He

makes a related argument that counsel failed to ensure that the State establish all the elements of forcible rape during L.T.'s direct examination.

L.T. testified on direct that Petitioner pulled her clothes down, stepped inside her pants, "and he got on me and he penetrated me, and then we left, he took me back home." Tr. 235-36. She later repeated those facts and specified that the Petitioner penetrated her with his penis and not his fingers. Tr. 241. Defense counsel cross-examined L.T., primarily about why she did not promptly report her claim and why she twice denied being raped. On redirect, the prosecutor said he would like to "make clear" whether Petitioner had L.T.'s permission to penetrate her. She answered no, and he asked whether she resisted. L.T. explained that she was in handcuffs. Defense counsel was then permitted re-cross, and he also explored resistance. L.T. said again that she was in handcuffs, with her pants around her ankles, and facing a man with a gun. Tr. 269-72.

Counsel could have perhaps objected to the scope of the prosecutor's redirect, but it is highly unlikely, given the discretion of the trial court and local practices, that the objection would have been sustained. It is a common practice in local state courts, evidenced by the many habeas transcripts that come before this court, to permit multiple rounds of examination from both sides until all ground has been covered. Objections to scope or continued questioning are almost never raised.

Petitioner complains that the State did not prove lack of consent during L.T.'s direct examination. The absence of consent was overwhelmingly suggested by the circumstances, and it was made crystal clear on redirect. There was no independent requirement that the

State establish all elements of the crime during the victim's direct examination, and the state court's denial of this <u>Strickland</u> claim based on the lack of objection to the scope of redirect was not an objectively unreasonable application of the <u>Strickland</u> principles.

### F.  Failure to Investigate Scientific Evidence

Petitioner argues that his counsel was ineffective because he did not investigate the conceded lack of medical or DNA evidence of the alleged rape.  A habeas petitioner who alleges a failure to investigate on the part of his counsel "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." <u>Gregory v. Thaler</u>, 601 F.3d 347, 352 (5th Cir. 2010).

Defense counsel based the defense in part on the lack of any DNA or other scientific evidence to link Petitioner to the alleged rape.  Petitioner now claims that counsel should have conducted a more thorough investigation into DNA testing of evidence at the crime lab. Petitioner affords no hint, however, as to what he believes would be revealed by such an investigation that would have helped the defense.  Petitioner must meet his burden on the existing state court record, and there is nothing in it to suggest further investigation would have revealed helpful information.  The state court was not unreasonable in rejecting this <u>Strickland</u> claim.

### G.  Speedy Trial

Petitioner was indicted on March 13 and arraigned on March 27, 2003.  He was released on bond.  The trial, after a number of continuances, began on January 18, 2005, less than two years later.  Petitioner represents that he told his attorney early in the proceedings

to request a speedy trial, but counsel allegedly said Petitioner was not entitled to that relief because he was not in custody. Petitioner raised this in his post-conviction application, and Judge Emanuel denied it because the only remedy under the Louisiana speedy trial statutes would have been release from bond pending trial. Tr. 537-38.

Petitioner responded that the Sixth Amendment also provides a right to a speedy trial, applicable to the states through the due process clause. Counsel, had he raised the issue as Petitioner says he desired, would have been faced with the balancing test of <u>Barker v. Wingo</u>, 92 S.Ct. 2182 (1972), which looks to the following factors: (1) the length of delay, (2) the reason for delay, (3) the assertion of the speedy trial right, and (4) prejudice to the accused. As for the delay, periods of less than five years are insufficient, by duration alone, to give rise to a presumption of prejudice and relieve the defendant of satisfying <u>Barker</u>'s prejudice prong. <u>U.S. v. Bishop</u>, 629 F.3d 462, 466 (5th Cir. 2010). As for a reason for the delay, the minutes indicate the case was set for trial six times, but continued either on motion of the State, motion of the defense, or without indication. The record before this court does not contain a transcript or other indication for the reasons for the requested continuances. Petitioner represents that it was because of L.T.'s unwillingness to testify. Defense counsel did cross-examine L.T. about whether she was aware of prior trial dates or received subpoenas. L.T. said she was aware of only one of the trial dates, and she adamantly denied ever receiving any subpoena. L.T. said she probably would have voluntarily appeared for the trial but was present because she was held on a material witness detainer. Tr. 251-53.

The next factor is assertion of the speedy trial right. Assuming counsel had raised it early, as Petitioner says he desired, the defense would still face the final factor of prejudice to the accused. This is assessed in light of three interests of the defendant: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. Amos v. Thornton, 646 F.3d 199, 208 (5th Cir. 2011). Petitioner was not incarcerated pending trial, and there is no factual basis in the record that he suffered any particular anxiety beyond that of the normal defendant who faces criminal charges. Petitioner appears to suggest that the defense was impaired by the delay because L.T. might not have appeared at an earlier trial date. This Strickland claim must be based on the existing state court record, and that record does not include sufficient facts to support that speculation.

Multiple trial continuances and delays of a few years between indictment and trial are not uncommon in the local state courts. Trial dates are often set with the realization that it is more likely that appearance on that date will be more in the nature of a status conference or opportunity for plea discussions as opposed to a firm trial date. Cases are continued for a multitude of reasons, including older cases taking precedence, or a party requesting more time to prepare. There is little reason to believe the case would have come to trial appreciably earlier even if counsel had made it known that his client desired a speedy trial. There is nothing but speculation as to whether the defense was impaired by the delay or whether there is a reasonable probability of a different verdict had counsel asserted the Sixth

Amendment speedy trial argument early in the proceedings. Considering all of these factors, the state court was not unreasonable when it denied the <u>Strickland</u> claim based on this issue.

### H. Appellate Counsel

Petitioner complains that his appellate counsel was ineffective because he did not recognize and raise the ineffective assistance of his trial counsel. The general rule in Louisiana is that a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court than by appeal. This creates the opportunity for a full evidentiary hearing if needed. <u>State v. Ellis</u>, 966 So.2d 139, 150 (La. App. 2d Cir. 2007). And when a habeas petitioner claims that appellate counsel omitted an issue that should have been raised, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. <u>Smith v. Robbins</u>, 120 S.Ct. 746, 764 (2000).

None of the <u>Strickland</u> claims asserted here are the kind that should have leaped off the page and influenced appellate counsel to go against the ordinary rule and seek relief on direct appeal. That can be a bad strategy because the appellate court may choose to address the claim on the merits and deny it before the defendant has the opportunity to better develop the issue and perhaps get the benefit of an evidentiary hearing if the claim were properly raised in a post-conviction application. When Petitioner did raise these issues in his post-conviction application, they were denied for lack of merit, undermining any claim of prejudice based on their absence from the direct appeal brief. The state court's rejection of this <u>Strickland</u> claim with respect to appellate counsel was not unreasonable.

## I.  Failure to Subpoena S.D. and Preston

Petitioner argues that counsel was ineffective because he did not attempt to impeach L.T. by calling at trial her roommate, S.D. and her boyfriend, Preston.  Judge Emanuel rejected this claim because Petitioner had mentioned only selected portions of those witnesses's statements, as reported in police reports, and the persons were not actual witnesses to the crime. They only heard statements made by L.T.  Tr. 537.

Defense counsel would have been taking a big risk to call those witnesses.  They told police that L.T. came home and immediately told them that Petitioner had required her to have sex with him.  Preston voiced suspicion that the sex was voluntary to get out of traffic tickets, but the only trial testimony he could offer would be L.T.'s statements and demeanor upon her return to the house.  All indications from the police reports are that such testimony from Preston and S.D. would have been detrimental to the defense.  The state courts were not unreasonable when they denied this Strickland claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 7th day of October, 2011.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE